UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Safeco Insurance Company of America,<br>*Plaintiff*,<br><br>v.<br><br>Roderick A. Vecsey and Pamela Vecsey,<br>*Defendants*. | Civil No. 3:08cv833 (JBA)<br><br><br><br>September 30, 2010 |

MEMORANDUM OF DECISION

This is a declaratory–judgment action brought by Plaintiff Safeco Insurance Company of America ("Safeco") against its insureds, Defendants Roderick A. Vecsey and Pamela Vecsey (collectively, "Defendants" or the "Vecseys"). After Ms. Vecsey was injured by a carrot thrown by Mr. Vecsey on July 14, 2006, she brought a personal–injury suit against him in Connecticut Superior Court (the "Vecsey Personal–Injury Action"),[1] and Mr. Vecsey sought liability coverage and legal defense under Safeco's two insurance policies issued to the Defendants. Safeco seeks a declaratory judgment that there is no coverage under either policy for the injuries Mrs. Vecsey sustained and that Safeco owes no duty under the policies to defend Mr. Vecsey in the Vecsey Personal–Injury Action or to indemnify him for any judgment issued in that action.

After a full trial on the merits, for the reasons that follow, the Court concludes that Safeco has shown entitlement to each of the declarations it seeks. Neither policy Safeco issued provides coverage to Roderick Vecsey because the July 14th incident falls within

---

[1] The Vecsey Personal–Injury Action in the Connecticut Superior Court, Judicial District of Fairfield, at Bridgeport, was Docket No. FBT–CV–08–5015319–S. (Am. Compl. [Doc. # 7–1] at ¶ 10; Defs.' Answers [Doc. ## 11, 14], at ¶ 10; Pl.'s Ex. 13.)

either or both policies' exclusions for abuse. As a corollary, Safeco owed no duty to defend Mr. Vecsey in, or indemnify him for the judgment issued in the Vecsey Personal–Injury Action.

I.      Findings of Fact

        A.      The Insurance Policies

Safeco issued to the Vecseys two insurance policies, each of whose periods ran October 25, 2005 through October 25, 2006. The first, a Quality–Plus Homeowners Policy (the "Homeowners Policy"), contained a personal–liability limit of $300,000 per occurrence, and the second, a Personal Umbrella Policy (the "Umbrella Policy"), contained a personal–liability limit of $300,000 per occurrence. (*See* Homeowners Policy, Pl.'s Ex. 12; Umbrella Policy, Pl.'s Ex. 11.) Mr. Vecsey was insured under both policies.

Each policy contains five provisions on which Safeco relies in arguing that no coverage is due for Mrs. Vecsey's injuries: (1) a provision that only bodily injuries resulting from an "occurrence," i.e., an "accident," are covered; (2) a provision requiring the insured to inform Safeco as soon as possible when a covered loss occurs or a claim is made or suit is brought against an insured;[2] (3) an exclusion for bodily injuries arising out of "abuse"; (4) an exclusion for bodily injuries resulting from intended acts; and (5) an exclusion for bodily injuries resulting from violations of criminal law.

The Umbrella Insurance Policy provides the following relevant definitions:

"Personal Injury" means:

---

[2] Brant Braddish, technical–claims consultant for Safeco testified that Safeco first received notice of Mrs. Vecsey's claim on April 2, 2008 when it received a copy of the Vecsey Personal–Injury Action filed by Mrs. Vecsey against Mr. Vecsey. (Trial Trans. at 29:12–20.)

   a. bodily injury, sickness or disease, disability or shock including required care, loss of services and death resulting therefrom;

   b. mental anguish or mental injury. . .

"Occurrence" means:

   a. an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the coverage period, in:

    (1) personal injury; . . .

   b. an offense, committed during the coverage period, which results in personal injury.

(Umbrella Policy at 1–2.)  The Homeowners Policy defines "*bodily injury*" to include "bodily harm, sickness or disease, including required care, loss of services and death resulting therefrom," and further provides:

"*Occurrence*" means an accident, including exposure to conditions which results in:

   a. bodily injury; or

   b. property damage;

during the policy period.  Repeated or continuous exposure to the same general conditions is considered to be one *occurrence*.

(Homeowners Policy at 20, 21.)[3]

   Each policy also contains a provision requiring the insured to notify Safeco when any incident that might involve Safeco occurs.  The Homeowners Policy provides: "An Insured's

---

[3] Although the Umbrella Policy (but not the Homeowners Policy) defines an "occurrence" to mean "an offense" in addition to "an accident," no party has argued for or against coverage on the basis of the undefined term "offense."

Duties After Loss.  In case of a loss to which this insurance may apply, you must . . . give immediate notice to us or our agent."  (Homeowners Policy at 9.)  The Umbrella Policy provides that an insured has two particular "Duties After Loss":

> a.      Upon the happening of an occurrence likely to involve us, written notice shall be given as soon as practicable to us or any of our authorized agents. . . .

> b.      If a claim is made or suit is brought against the insured, the insured shall immediately notify us in writing.  Also, forward to the underlying insurers and to [Safeco] every demand, summons or process received by the insured.

(Umbrella Policy at 5.)

Each policy also contains an exclusion for physical or mental abuse.  In pertinent part, the Umbrella Policy states that it "does not apply" to "[a]ny personal injury arising out of sexual molestation or sexual harassment or physical or mental abuse" (Umbrella Policy at 4), and the Homeowners Policy's coverage for "personal liability" and "medical payments to others" expressly "do[es] not apply to *bodily injury* or *property damage*: . . . arising out of physical or mental abuse, sexual molestation or sexual harassment" (Homeowners Policy at 15).  Neither policy defines "abuse" or "physical abuse."

In addition, each policy contains an intentional–acts–or–injuries exclusion.  In pertinent part, the Umbrella Policy states that it "does not apply" to "[a]n insured who commits or directs an act with the intent to cause a loss" (Umbrella Policy at 4), and the Homeowners Policy's coverage for "personal liability" and "medical payments to others" expressly "do[es] not apply to *bodily injury* or *property damage*: . . . which is expected or

intended by any *insured* or which is the foreseeable result of an act or omission intended by any *insured*" (Homeowners' Policy at 13).

Finally, each policy has a criminal–injuries exclusion. The Homeowners Policy states that it does not cover a "personal injury . . . injury arising out of any illegal act committed by or at the direction of any insured," and also provides that "Personal Liability does not apply to . . . [l]iability . . . arising out of any illegal act committed by or at the direction of any *insured*." (Homeowners Policy at 15, 21.) The Umbrella Policy provides that it "does not apply to . . . [a]ny injury caused by a violation of a penal law or ordinance committed by or with the knowledge or consent of any insured, except those caused by violation of a motor vehicle law." (Umbrella Policy at 4.)

B.      The Vecseys' Relationship and the July 14th Incident

The Vecseys lived in Monroe, Connecticut with their daughters Marissa and Kaelin. Mr. Vecsey worked in the managerial ranks at MTA Metro–North Railroad at an office within a five–minute drive from their home; Mrs. Vecsey operated a medical–transcription business out of their home, and during the school year she also worked as a para–professional at Monroe Elementary School with children with special–education needs. (Trial Trans. at 402:19–22, 539:17–20.) By the time of trial, their daughters Kaelin and Marissa were college students in their early 20s.

Marissa had made a doctor's appointment for the afternoon of July 14, 2006 "for a checkup to get into college." Although Mrs. Vecsey was home, Marissa called Mr. Vecsey at work, to give her a ride to the doctor's office. (Trial Trans. at 356:21–357:6.) According to Mr. Vecsey, Marissa asked him to give her a ride because "[s]he felt that her mother

wasn't able to give her a ride" because she "seemed to think [Mrs. Vecsey] was intoxicated." (*Id.* at 357:7–14.) Mr. Vecsey came home, asked Mrs. Vecsey "which doctor we had to bring [Marissa] to," and thereafter drove to the doctor's office, with Marissa following in her own car behind him. (*Id.* at 357:22–358:14.) He left before the end of Marissa's appointment, came home, "grabbed a carrot from . . . the refrigerator, started eating that, [and] eventually went upstairs," where he found Mrs. Vecsey, who "was in the office." (*Id.* at 358:15–359:5.) The carrot Mr. Vecsey had begun eating was approximately eight inches long—not a baby carrot. (*Id.* at 359:9–12, 380:2–8.) Mr. Vecsey said that Mrs. Vecsey did not appear intoxicated, and when he saw her, he "said 'real nice job, you couldn't take your daughter to the doctor's.' And that was it, I turned around, I went back to my room—our room, my bedroom." (*Id.* at 360:19–361:25.) He testified that he was "uncomfortable going to a girl's doctor" and was "frustrated" that he had to take Marissa to the doctor when Mrs. Vecsey was at home, but claimed that he was not "angry." (*Id.* at 361:2–15, 363:11–16, 366:21–367:5.) As he walked toward the bedroom she said "a snide remark," after which she followed him into the bedroom and they "ha[d] words." (*Id.* at 365:19–366:8.) According to Mr. Vecsey, "[i]t started out talking and it started to g[e]t a little louder," after which Kaelin "came down and just told both of us to relax and cut it out" in order to "end the argument" that Defendants were having. (*Id.* at 366:9–20.)

The Vecseys' bedroom was 20–plus feet long. When Kaelin came to tell her parents to stop their argument, Mr. Vecsey was standing at a bedroom window, and Mrs. Vecsey was standing at the side of the bed, approximately 17 feet away. (*Id.* at 380:24–381:19; Defs.' Exs. 9c, 9d.) Mr. Vecsey, who had been eating the carrot throughout their exchange, was holding

the remaining carrot, which at that point was approximately the diameter of a quarter and about an inch long. (Trial Tr. at 380:9–23.) Mr. Vecsey "was looking out the window up the street, . . . staring out the window trying to listen to what [Kaelin] and [Mrs. Vecsey] were saying back and forth." (*Id.* at 371:5–10.) Mr. Vecsey testified:

> Q.     And what were they saying?
>
> A.     Basically just, "ma, calm down, stop it." And I don't remember what [Mrs. Vecsey] was saying back, but that went on for a short time.
>
> Q.     Who was [Kaelin] saying "calm down" and "stop it" to?
>
> A.     [Mrs. Vecsey].
>
> Q.     And why was she saying it to [Mrs. Vecsey] to calm down and stop it?
>
> A.     Just because I wasn't saying anything, and [Kaelin] said, you know, both of yous [*sic*], just quiet down or shut up, whatever she said, and then she had mentioned to [Mrs. Vecsey], "Ma, just stop it." . . .
>
> Q.     Okay. At that point what did you do after you were looking out the window?
>
> A.     I was staring out the window, they were going back and forth, back and forth, I took another bite of the carrot, and I just turned around and said "Would you just stop." I threw the carrot, not at my wife, I didn't intend to hit anybody with the carrot, it was just exasperated, frustrated, just—you know, it wasn't that big of a deal for me to drive my daughter to the doctor's and I didn't want it to get into any bigger of an argument, and it was just I threw the carrot towards the wall. . . .
>
> Q.     It was in the direction of the wall that your wife and daughter were standing next to?
>
> A.     Right. Right, correct. . . .
>
> Q.     And you certainly intended to throw the carrot, correct?
>
> A.     Yes.
>
> Q.     Now, at some point before you threw the carrot, isn't it true that your wife swore at you?
>
> A.     Yes.
>
> Q.     What did she say?

A.     I don't remember the exact words, but cursing is not uncommon in my household. I have a very colorful vocabulary.

Q.     Was it uncommon for you to curse in the household?

A.     No.

Q.     It's not uncommon for your wife to curse in the household?

A.     No, or my children.

Q.     Did that upset you when she cursed at you?

A.     No.

Q.     Then why did you throw the carrot?

A.     I just told you, I was exasperated.  I just wanted it to stop.  It wasn't anything worth getting into argument about, that I had to drive my daughter.  The same way I told other people this, that, you know, when you are talking, sometimes, all right, enough is enough, and you don't mean to slam your hand down, but it's just . . . [a] reaction out of frustration or exasperation. . . .

Q.     Did you think that throwing the carrot would cause your wife to shut up?

A.     No, I wasn't thinking of anything at the moment.

Q.     Well, you must have been thinking something, sir.

A.     I don't remember exactly what I was thinking but, I know I didn't intend to hit anyone, hit, [Mrs. Vecsey] or my daughter.  They were standing that close together.

Q.     Do you always throw objects in the direction of your wife when you're not thinking anything and you are having a conversation?

A.     No.

(*Id.* at 371:11–375:4.)  Mr. Vecsey testified that he did not throw the carrot "to get [Mrs. Vecsey] to be quiet."  (*Id.* at 375:23–376:5.)  The Vecseys both testified that the carrot thrown by Mr. Vecsey struck Mrs. Vecsey in her left eye, causing her substantial injuries including a ruptured globe (eyeball), broken orbital bones, massive swelling, and permanent blindness in her left eye.  Mrs. Vecsey was taken to Bridgeport Hospital, where she was seen by medical residents.  The next day she went to Yale–New Haven Hospital where she spoke

with a social worker at the hospital, and where she thereafter underwent surgeries performed by Zachary Klett.

Although he took issue with the word "abuse," Mr. Vecsey also testified that he and Mrs. Vecsey had a verbally hostile relationship:

> Q.   [Have you] ever verbally abused your wife?
>
> A.   I think I've stated earlier I have a loud voice and I have a colorful language, but not intentionally abusing anyone verbally.
>
> Q.   There is a difference between having a loud voice and abusing someone, you would agree with that, right?
>
> A.   I would imagine so yes. . . .
>
> Q.   Have you ever ridiculed [Mrs. Vecsey]?
>
> A.   I probably have.
>
> Q.   Did you ever do it in front of other people?
>
> A.   Not that I can think of any specific incident.
>
> Q.   Did you do ever do it front of your daughters?
>
> A.   If I did they were probably around.
>
> Q.   Did you ever call her names, malicious names?
>
> A.   If you give me an example I could say yes or no.
>
> Q.   You mentioned there is a lot of cursing. Did you ever call her by a name that is a curse word that is an expletive like one that begins with a B for example?
>
> A.   Oh, probably.

(*Id.* at 403:11–404:17.)

Mr. and Mrs. Vecsey and Kaelin testified about the July 14th incident, and all of the Vecseys testified about the relationship between Mr. and Mrs. Vecsey. Mrs. Vecsey acknowledged at trial that at the hospital she spoke with a social worker and told the social worker that the July 14th incident "was the first instance of physical abuse" and that she had testified in deposition "that the statement that this was an incident of physical abuse was a

true statement." (*Id.* at 529:12–530:22.)  At trial, she unconvincingly backtracked, claiming that she had reconsidered "the definition of physical abuse," and that her statement to the social worker was true only insofar as "physical abuse [means] that something physical hit my eye." (*Id.* 530:13–22.)  She also testified that their relationship was marked with verbal hostility.  Acknowledging that she had filed for divorce after the Vecseys had unsuccessfully "tr[ied] to mend [their] marriage," she testified as follows:

> Q.  Well, let me ask you a question. If this was simply an accident, what did you need to mend?
>
> A.  My husband and I had troubles in our marriage.  We were working on that.
>
> Q.  And the troubles you had in your marriage were the history of verbal abuse?
>
> A.  We argued. [Mr. Vecsey] is a yeller.  I would yell back.  We argued, yes.
>
> Q.  Did he ever call you names?
>
> A.  I suppose, yes in an — an argument, sure.
>
> Q.  Did he ever swear at you?
>
> A.  Yes he has.
>
> Q.  Did he call you by [a] derogatory [expletive] that begins with a B on occasion?
>
> A.  I'm sure he has.
>
> Q.  How did that make you feel?
>
> A.  How does it make anybody feel when they're called names?
>
> Q.  It's degrading?
>
> A.  I work in an elementary school I deal with it all the time kids calling kids names it happens. . . .
>
> Q.  Why were you self medicating with alcohol?
>
> A.  As I said to you, my husband and I had a difficult marriage.
>
> Q.  Would you characterize it as [an] abusive marriage?
>
> A.  I've learned better than to use that word abusive without specifically stating what I mean.  So I would like. . . . So I would like to do that

now.  When I say abusive I mean we were arguing verbally abusive yes.  We were very vocal verbal people.  When we had an argument it was loud and we[] yelled and we said things that weren't nice to each other.

Q.     And he called you names?

A.     I probably called him names, too.

(*Id.* at 538:23–539:18, 541:24–542:15.)  In contrast to Mr. Vecsey's testimony, Mrs. Vecsey stated that when Mr. Vecsey returned from Marissa's doctor's office, he was angry, not simply frustrated:

Q.     And what happened when he returned home from Marissa's doctor's?

A.     He was angry.

Q.     Did he yell?

A.     Yes.  Yes he did.

Q.     Did he seem enraged?

A.     He seemed — he was just like he always is when he's angry and how is he when he's angry.  [Mr. Vecsey] is a yeller.

Q.     He's a yeller?

A.     Yes he's a yeller.

Q.     And a name caller?

A.     When he's yelling, yeah.

Q.     And he swears?

A.     Yeah.

Q.     And how did that make you feel?

A.     I was angry, too, so we were angry with each other. . . .

Q.     Well, do you recall any of the subject matter of the argument on the afternoon of July 14, 2006?

A.     Yes. I remember him being angry that I was drunk and couldn't take our daughter to her doctor's appointment.  I remember that he was angry that he had to leave work.  I'm sure that we discussed other things, I don't specifically remember what they are. . . .

Q.     Where did the argument begin? What portion of the house?

A.    I'm not exactly certain. When [Mr. Vecsey] and I argue we tend to just move around and, you know, we're talking and yelling and, you know, moving around.

Q.    Were you trying to get away from him?

A.    No, it's just how we are. That's just our pattern when we argue. We don't sit across the table from each other and discuss what disturbs us about each other.

Q.    That's not a calm debate?

A.    No it's not. . . .

Q.    Do you recall any specific words he said to you during the argument [on July 14, 2006]?

Q.    While it was taking place in the bedroom?

A.    You know, there was just a lot of name calling kind of thing. The usual.

Q.    And swearing?

A.    Yeah. . . .

Q.    Do you recall at some point [Mr. Vecsey] turning and throwing an object in your direction?

A.    No, I don't.

Q.    You didn't see it actually?

A.    I didn't, no.

Q.    And is that because you weren't looking in his direction when he threw the object?

A.    What I recall at that particular moment was I was planning to walk into the bathroom, I was turning to walk into the bathroom, I believe [Mr. Vecsey] was turning to leave the room because, you know, it was go to hell, fuck you, whatever it was that was said and that's what I remember, and then I remember something striking me.

(*Id.* at 548:18–556:10.)  In response to questions about her use of the term "abuse" with the social worker at the hospital, Mrs. Vecsey testified:

Q.    But you did tell the . . . the social worker this was the first incident of physical abuse?

A.    I believe I stated to you that at that time I did not know what the correct word — what the correct terminology would be to use.

12

| Q. | For purposes of insurance? |
|---|---|
| A. | No for purposes of people understanding what I was saying. Throughout this entire episode of my life I have said nothing other than my husband never intended to hurt me, that this was an accident, that . . . he never physically abused me ever, ever. |
| Q. | Didn't you know from your work as a special ed teacher what abuse was? |
| A. | I deal with autistic children and children with Down's syndrome. No, I — no. |
| Q. | You don't ever see children of abusive households in the course of your work? |
| A. | Well do you know what as matter of fact I do. Sometimes I see verbal abuse which is why I felt comfortable to use that term and not have it be construed as physical abuse. To me, when you say verbal abuse that's arguing. |

(*Id.* at 580:21–581:21.) Both Marissa and Kaelin Vecsey testified that arguments were a common occurrence between their parents. (*Id.* at 596:15–597:3, 636:25–637:13.) In response to the question whether Mr. Vecsey was "ever verbally abusive towards [her]," Marissa testified that they "would get into arguments, yes." (*Id.* at 597:11–13.)

II. Conclusions of Law

A. Summary

Although Safeco advances a number of theories for why Mr. Vecsey's liability in the Vecsey Personal–Injury Action is not covered by either the Homeowners Policy or the Umbrella Policy, the argument relevant to the Court's decision is its argument that coverage for Mrs. Vecsey's injuries "is excluded under the Homeowner and Umbrella [P]olicy exclusions for bodily injury and personal injury arising out of physical or mental abuse." (Pl.'s Trial Mem. at 24; *see id.* at 24–27.)

The Court will assume without deciding that Mrs. Vecsey's were caused in the manner the Vecseys claimed, *i.e.*, that Mrs. Vecsey's eye was hit by the carrot thrown by Mr. Vecsey.[4]  It will further assume without deciding that, absent an applicable exception, the injuries would fall within coverage as injuries caused by an "occurrence."  However, based on the trial evidence and reasonable inferences to be drawn therefrom, the Court concludes that these injuries fall within the physical–or–mental–abuse exclusions in both the Homeowners Policy and Umbrella Policy.  Because this conclusion entitles Safeco to judgment in its favor on all counts, the Court will not make any additional factual findings or conclusions on Safeco's other theories.

---

[4] Two expert witnesses testified regarding Mrs. Vecsey's injuries and their opinions about the injuries' cause.  Dr. Klett, an ophthalmologist with an ocular plastics subspeciality focusing on eyelid and orbital surgery and reconstructive surgery, was in 2006 a Yale Medical School eye department faculty member.  (Trial Tr. at 431:3–432:15.)  Dr. Klett treated Mrs. Vecsey at Yale–New Haven Hospital after she had initially been seen by one of the residents at Bridgeport Hospital. (*Id.* at 436:3–15.)  He opined that the carrot could have caused Ms. Vecsey's injuries: "the cause of the injury as it was described by Ms. Vecsey is certainly consistent with the injuries that she sustained." (*Id.* at 446:5–7.)  Charles Edward Bain, a consultant for Biodynamic Research Corporation who was formerly a practicing medical doctor with certifications in emergency medicine, family medicine, and traffic accident reconstruction, testified that while a practicing physician he saw "hundreds" of patients with eye injuries. (*Id.* at 226:3–228:5.)  Dr. Bain did not treat or speak with Mrs. Vecsey, but from her medical records and photographs of her taken after the July 14th incident and through her medical treatment, he opined that "[Mrs.] Vecsey sustained two injuries to her eye, one was the socket injury including the globe rupture and the fractures and the other was the bruising around the eye," and that it "was not the piece of carrot that did this." (*Id.* at 242:1–4.)

B.	Principles of Law

The Connecticut Supreme Court has recently restated the principles of construction applicable to insurance coverage disputes, which govern the Court's interpretation of the Homeowners Policy and Umbrella Policy at issue in this case:

> Construction of a contract of insurance presents a question of law for the court. . . . An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract. In accordance with those principles, the determinative question is the intent of the parties, that is, what coverage the insured expected to receive and what the insurer was to provide, as disclosed by the provisions of the policy. If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. Under those circumstances, the policy is to be given effect according to its terms. When interpreting an insurance policy, [the Court] must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result.
>
> In determining whether the terms of an insurance policy are clear and unambiguous, a court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity. Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. Under those circumstances, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy. This rule of construction may not be applied, however, unless the policy terms are indeed ambiguous.

*Nat'l Grange Mut. Ins. Co. v. Santaniello*, 290 Conn. 81, 88–89 (2009) (ellipses and alterations in *Santaniello* omitted) (quoting *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 372–73 (2008) (quoting *Conn. Medical Ins. Co. v. Kulikowski*, 286 Conn. 1, 5–6 (2008)); *see also Israel v. State Farm Mut. Auto. Ins. Co.*, 259 Conn. 503, 508–09 (2002) (reciting similar

standards, explaining that rule requiring resolution of ambiguity in favor of insured is a "canon[] commonly styled *contra proferentem*," and observing that that canon "is more rigorously applied in the context of insurance contracts than in other contracts").

C.    The "Abuse" Exclusion

1.    Defining "Abuse"

Although both policies contain exclusions for injuries arising out of physical or mental abuse, without definitions, and even though there exist "multiple definitions of those words contained in the dictionary," these facts do not render the terms ambiguous. *See Cmty. Action for Greater Middlesex Cnty., Inc. v. Am. Alliance Ins. Co.*, 254 Conn. 387, 401 (2000) ("The fact that a word may have several definitions does not necessarily render it ambiguous.").

In this case, the Vecseys urge two readings of the term "abuse" that, in their view, show that Mr. Vecsey's conduct falls outside the abuse exclusion. They assert that if either is a reasonable reading of the term "abuse," then notwithstanding any other reasonable definition, the term "abuse" would be ambiguous, and thus subject to the canon of *contra proferentem* requiring construction of the term in favor of coverage.[5] First, the Vecseys argue that the term can reasonably be read to include an element of intent—that is, that an act is not abuse unless the actor intended to cause some sort of harm (whether or not the harm intended was the harm actually caused). Second, they argue that the term "abuse" can

---

[5] Mr. Vecsey's and Mrs. Vecsey's trial memoranda are identical and contain the same argument regarding the abuse exclusion. The Court will therefore cite them together as "Defs.' Trial Mem." The issue of whether the terms "abuse" or "physical abuse" are ambiguous was also addressed during summations, during which counsel for Mr. and Mrs. Vecsey made similar arguments.

reasonably be read to refer only to a pattern of conduct.  The Court finds neither argument

persuasive and holds that "abuse" is unambiguous as set forth below.[6]

As Defendants correctly point out, there are no Connecticut Supreme Court cases

defining the non–sexual application of the term "abuse" in the context of an insurance

policy.[7]  There are, however, cases that construe the term in other contexts, as well as lower

---

[6] Defendants argue that because Safeco's Rule 30(b)(6) witness testified in his deposition that it was "fair to say" that "the term physical abuse connotes an intentional act" (Stutts Dep., Defs.' Exs. 20 & 21, at 38:12–14), this admission controls the clause's meaning. Because this Court now holds that the term "abuse" is not ambiguous, Defendants may not use this parol evidence to "vary or distort" that unambiguous meaning.  *Heyman Assoc. v. Ins. Co. of State of Pa.*, 231 Conn. 756, 779 (1995) (unambiguity of a contractual term "necessarily dictates our rejection" of party's attempt to introduce parol evidence on that term).

[7] In *Community Action for Greater Middlesex County, Inc.*, the plaintiff agency that "provides a preschool training program," sued its insurer for breach of contract after the insurer declined defense or indemnification for the plaintiff when it was sued by the parents of a six–year–old girl who alleged that while their daughter was enrolled in the plaintiff's program, "she was sexually molested and sexually abused by three boys who were in her class" when "the three boys had 'grabbed and fondled' [her] vagina."  The insurer "rel[ied] on the abuse or molestation exclusion contained in the insurance policy."  254 Conn. at 389–91.  Rejecting the argument that "the exclusion is ambiguous because the policy does not define the words 'abuse' and 'molestation'" and because there are "multiple definitions of those words contained in the dictionary," the Connecticut Supreme Court held:

> The fact that a word may have several definitions does not necessarily render it ambiguous. The policy exclusion exempts the defendant from liability for "the actual or threatened abuse or molestation by anyone of any person." Whatever other conduct that broad language may include within its purview, it certainly includes unwanted contact of a sexual nature.

*Id.* at 401 (ellipsis omitted); *see also id.* at 401–02 (noting that "[o]ther courts also have concluded that a policy exclusion for abuse or molestation is unambiguous," citing other sexual–abuse cases, and observing "[i]n fact, the plaintiff has not identified any case, and we are aware of none, in which a policy exclusion for abuse or molestation has been deemed ambiguous.  We conclude, therefore, that the language of the plaintiff's policy excluding

state–court cases applying the term as it appears in an insurance policy exclusion, enabling the Court to "carefully predict" how the state's highest court would rule on the issues presented by this case.[8]

a.   "Abuse" Does Not Require Intent to Harm, Requires More Than Mere Fortuity, and Involves Acts that Are Inappropriate "Uses" of Another Person

In light of the separate and distinct intentional–acts–or–injuries exclusion in each policy that excludes coverage where the "loss was expected or intended by the insured" and not merely foreseen by the insured, *see Vermont Mut. Ins. Co. v. Walukiewicz*, 290 Conn. 582, 597 (2009),[9] construing the exclusion for "physical or mental abuse" to include an implicit intent–to–harm requirement would render it redundant. *See Merrimack Mut. Ins. Co. v. Ramsey*, 117 Conn. App. 769, 772–73 (2009) (reading "implicit intentionality requirement" into physical–abuse exclusion "is plainly unreasonable" because clause

_____

abuse and molestation from coverage is clear and unambiguous.").

[8] Because this Court, sitting in diversity, is faced with questions of state law that have not been resolved by the Connecticut Supreme Court, this Court must "'carefully predict how the state's highest court would resolve the uncertainties'" of state law relevant to the matter before it. To do so, the Court "'give[s] the fullest weight to pronouncements of the state's highest court . . . while giving proper regard to relevant rulings of the state's lower courts.'" *See, e.g.*, *Runner v. New York Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009) (quoting *The Travelers Ins. Co. v. Carpenter*, 411 F.3d 323, 329 (2d Cir. 2005)).

[9] *Walukiewicz* addressed an exclusion from coverage for injury or damage "[w]hich is expected or intended by the 'insured.'" 290 Conn. at 586. While the language of that exclusion differs from the Umbrella Policy, which is an exclusion for "[a]n insured who commits or directs an act with the intent to cause a loss," the holding in *Walukiewicz*—that the term "intent" in the exclusion means that the exclusion "is triggered when the insured subjectively expects or intends that bodily injury will occur, and not merely when an ordinary, reasonable person would be able to foresee injury occurring as a result of his acts," *id.* at 597—applies to the intentional–act–or–injury exclusions at issue in this case.

18

contains no language "provid[ing] that a consideration of the abuser's intent is required. In fact, the policy contains a separate exclusion that applies specifically to intentional acts."), *cert. denied*, 294 Conn. 920 (2009).[10] A reflection of how the term "abuse" is understood "from the perspective of a reasonable layperson in the position of the purchaser of the policy," *see Santaniello*, 290 Conn. at 99 (quoting, in parenthetical, *Ceci v. Nat'l Indem. Co.*, 225 Conn. 165, 168–69 (1993)), is Mrs. Vecsey's testimony, when backtracking from her statements to the hospital social worker, that she did not understand the term abuse to require any intent to harm.

Webster's III Dictionary defines the verb "abuse" to mean (1) "[t]o use improperly: misuse," (2) "[t]o harm or injure by maltreatment," (3) [t]o rape or molest," or (4) [t]o assail

---

[10] *See also Cmty. Action for Greater Middlesex Cnty., Inc.*, 254 Conn. at 400, 403 (interpreting exclusion for "actual or threatened abuse or molestation" and holding that "[t]here is nothing in the language of the exclusion to indicate that the alleged abuse or molestation must be sexually motivated or calculated to arouse the person or persons involved in the offending conduct; the boys' nonconsensual grabbing and fondling of Poe fall within the plain meaning of the words 'abuse' and 'molestation' irrespective of the boys' subjective state of mind."); *Covenant Ins. Co. v. Sloat*, 34 Conn. L. Rptr. 687, No. 385786, 2003 WL 21299384, *10 (Conn. Super. Ct. May 23, 2003) (describing exclusion for "physical or mental abuse" as "preclud[ing] coverage for an entire class of risks arising out of specified conduct, and . . . not turn[ing] on the intent of the insured"); *see also Nautilus Ins. Co. v. Our Camp. Inc.*, 136 F. App'x 134, 138 n.2 (10th Cir. 2005) ("the common definitions of "abuse" and "molestation," do not require an element of intent" (citing *Cmty. Action for Greater Middlesex County, Inc.*)); *Erie Ins. Exchange v. First United Methodist Church*, 690 F. Supp. 2d 410, 414 (W.D.N.C. 2010) ("other courts that have addressed the issue of whether these definitions include an element of intent, in the context of children harmed by other children, have found that it does not"); *Saunders ex rel. Wright v. Sperry*, 228 Wis.2d 511, 597 N.W.2d 774 (Table), 1999 WL 272540, *2 (Wis. App. Ct. May 6, 1999) (concluding that "the policy's abuse exclusion" is not "limited to intentional acts"); *Am. Fam. Mut. Ins. Co. v. Chiczewski*, 298 Ill. App. 3d 1092, 1095, 700 N.E.2d 777, 778–79 (Ill. App. Ct. 1998) (rejecting argument that "the term 'abuse' is inherently ambiguous" and holding that "[abuse] exclusion" contains "no intent requirement").

with insults: revile." Webster's III Dictionary 4 (3d ed. 2005). It defines the noun "abuse" as (1) "[i]mproper use: misuse," (2) "[p]hysical maltreatment," or (3) "[c]oarse or insulting language." *Id.* The Oxford English Dictionary defines the noun "abuse," in pertinent part, to be both "[w]rong or improper use, misuse, misapplication, perversion," and "[a] bad or improper usage (i.e. a use which has become chronic), a corrupt practice." *Id.* Finally, Black's Law Dictionary defines the noun "abuse" to mean both "[a] departure from legal or reasonable use; misuse" and "[p]hysical or mental maltreatment, often resulting in mental, emotional, sexual, or physical injury." Black's Law Dictionary 10 (9th ed. 2009).[11] These interrelated dictionary definitions of the noun and verb "abuse" indicate that the term "abuse" is defined by reference to an act's relationship to, and deviation from, some baseline measure of the scope of what conduct is appropriate.[12]

---

[11] As noted above, the Connecticut Supreme Court has held that the word 'abuse' is not ambiguous notwithstanding multiple dictionary definitions. *Cmty. Action for Greater Middlesex Cnty., Inc.*, 254 Conn. at 401–02. *See also S.C. Farm Bureau Mut. Ins. Co. v. Oates*, 356 S.C. 378, 383, 588 S.E.2d 643, 646 (S.C. App. Ct. 2003) (noting that term "abuse" was not ambiguous, and holding that "the common meaning of 'abuse' in conjunction with the other language of the [insurance policy]" could be determined by definitions found in *Black's Law Dictionary* and *American Heritage Dictionary*, which are substantively identical to definitions relied on by this Court); *Sperry*, 1999 WL 272540 at *1–*2 (rejecting argument "that the term 'physical or mental abuse of a person' is ambiguous because reasonable persons could understand it to include a wide range of negligent acts or to be limited to intentional acts," holding that term is not ambiguous, and defining "abuse" by reference to Webster's dictionary's definition ("physically harmful treatment") and listed synonym ("maltreatment"), and holding that "any ordinary, reasonable person would consider shaking an infant hard enough to cause hemotomas, hemorrhaging and a broken bone . . . constitute[s] maltreatment, or abuse").

[12] Bolstering the Court's conclusion that "abuse" is a "use" that falls below—that is, stands "away from"—an appropriate use is the prefix "ab" in the term "abuse," which carries the meaning of "position away from," *see* Oxford English Dictionary (defining "ab–").

This definition is reinforced as the common thread among the myriad types of "abuse" typically encountered in the current vernacular. Substance abuse, abuse of trust, sexual abuse, domestic abuse, abuse of authority, to name a few, all involve a deviation in behavior or "use" from what is expected or appropriate. Each involves a perversive or improper use, be it of a tangible or intangible item or a relationship. "Abuse" of another person stems from this same universality; improper treatment by interacting with or "using" the other in a way that deviates from a baseline measure of what is appropriate.

Further reinforcing the definition of abuse as maltreatment that deviates from a baseline standard of appropriateness are terms in the various dictionary and case–law definitions that connote insult and mistreatment. Webster's III uses "maltreatment" and "insult" to define "abuse," Webster's III Dictionary 4 (3d ed. 2005), and Black's emphasizes "[p]hysical or mental maltreatment," Black's Law Dictionary 10 (9th ed. 2009). Connecticut courts have used the terms "abuse" and "mistreatment" interchangeably in other contexts. *See, e.g., State v. Health Care Emp. Union, Dist. 1199*, 271 Conn. 127, 137–38 (2004) (finding an arbitrator's award reinstating department of mental retardation employee despite finding that he "had abused a client" contravened the public policy against "mistreatment of persons in the department's custody"); *Rivera v. Rivera*, No. FA000373859S, 2002 WL 237028, *2 (Conn. Super. Ct. Jan. 22, 2002) ("[T]he defendant left the marital home in Puerto Rico to escape physical *abuse* and to re-unite with her oldest child, the plaintiff soon followed and the *mistreatment* continued.").

The Court therefore concludes that an improper "use," or maltreatment, of another is "abuse." Stated another way, an act constitutes "abuse" if it deviates from proper "use," and "abuse" of another person is therefore maltreatment that deviates from a baseline

societal understanding of what is appropriate conduct. The act of abuse may, but is not required to be motivated by an insured's subjective expectation or intent that *bodily* injury will occur.

Further, and contrary to Defendants' reading, the exclusion does not appear to contemplate two distinct forms of non–sexual abuse, that is, "physical abuse" and "mental abuse," as it does by use of the modifier "sexual," to describe each "molestation" and "harassment." In contrast, the term "abuse" is used only once with two descriptive modifiers, "physical" and "mental" ("physical or mental abuse"). Therefore, even though the parties agree that Mrs. Vecsey's injuries do not arise out of Mr. Vecsey's "mental abuse" of her, the pervasive abusive nature of their relationship provides a critical context in which to determine whether Mrs. Vecsey's injuries constituted "bodily injury . . arising out of physical or mental abuse."

                          b.       "Abuse" Does Not Imply or Require a Pattern of Conduct

The Court also rejects Defendants' argument that an act cannot be "abuse" unless it is part of a pattern of conduct for three reasons. First, where the insurance policies intended to refer to repetitive conduct, they expressly described it. The Umbrella Policy defines an "[o]ccurrence" to mean "an accident, including *continuous or repeated exposure* to substantially the same general harmful conditions." (Umbrella Policy at 1–2 (emphasis added).) Similarly, the Homeowners' Policy specifies that "[*r*]*epeated or continuous exposure* to the same general conditions is considered to be one occurrence." (Homeowners Policy at 21 (emphasis added).) By contrast, neither policy relates the singular noun "abuse" to a pattern of conduct or repetitious acts.

Second, although it has not expressly so held, the Connecticut Supreme Court appears to be of the view that a single act can constitute "abuse." In *Berry v. Loiseau*, the court described a plaintiff's "being punched and choked" as "*repeated* physical abuse." 223 Conn. 786, 793 (1992) (emphasis added).[13] Numerous state–court divorce and child–custody cases also refer to a "*pattern* of abuse" or abuse that is "chronic."[14] *See also* Conn Gen. Stat. § 45a-717(g) (providing, as grounds for termination of parental rights, a parent's "severe physical abuse *or* a *pattern of* abuse" (emphases added)). The phrases "repeated physical abuse" and "pattern of abuse" would be superfluous and redundant if the term "abuse" already connoted chronic, repeated, or patterned conduct.

Finally, given the insurer's express intent to exclude coverage for losses arising from abuse, it would be counter–productive to cover a loss where the causal act was the first

---

[13] *See also*, *e.g.*, *United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 99 (2d Cir. 2000) (describing theory of prosecution of a person who allegedly "engaged in a pattern of sexual and physical abuse of boys entrusted to his care"); *Elmowitz v. Executive Towers at Lido, LLC*, 571 F. Supp. 2d 370, 378–79 (E.D.N.Y. 2008) (describing case "where the defendant allegedly repeatedly physically abused plaintiff").

[14] *See, e.g.*, *In re Andrew R.*, Nos. U06CP05005442A, U06CP05005443A, U06CP06005781A, 2009 WL 1874190, *3 (Conn. Super. Ct. June 9, 2009) ("[t]he father has a history of chronic substance abuse"); *Bonilla v. Bonilla*, No. FA074012515S, 2009 WL 1706900, *2 (Conn. Super. Ct. May 22, 2009) (finding "no credible evidence that would support a pattern of spousal abuse"); *In re Christine B.*, Nos. H12CP07011454A, H12CP07011457A, H12CP07011455A, H12CP07011456A, 2009 WL 1175680, *2 (Conn. Super. Ct. Apr. 8, 2009) (noting that mother has inflicted "repeated, extreme abuse o[n] her own children"); *In re Selena O.*, No. H12-CP04-011822-B, 2008 WL 3307108, *15 (Conn. Super. Ct. Jul. 7, 2008) (noting mother's "continued chronic substance abuse"); *In re Daniel M.*, No. H12CP07011630A, 2008 WL 2744872, *23 (Conn. Super. Ct. June 10, 2008) (noting that Department of Children and Families lists both "the parent ha[ving] inflicted severe physical abuse on the child" and "the parent ha[ving] engaged in a pattern of abuse against the child" as circumstances precluding reunification of parent and child).

instance of an act that was later repeated, while excluding coverage for the second, third, or subsequent instance of the same act. Where an act is performed a number of times—*i.e.*, a pattern of the same conduct—Defendants make no argument that that act is intrinsically less harmful or abusive the first time it is performed. In other words, there is nothing about an abusive act in isolation or as the first in a series of acts that makes that first or only act not "abuse" as compared with subsequent acts. Reading the term "abuse" to require patterned conduct also introduces substantial coverage complexities, including how many acts are needed to form a "pattern," and whether an act is sufficiently similar to other acts to be part of a pattern of acts rather than a dissimilar, isolated act. Indeed, there is no indication that either Safeco or the Vecseys intended or understood the abuse exclusion to introduce these complications.

For these reasons, the Court declines to read the term "abuse" to imply or require a pattern of conduct. To the contrary, a single act can constitute "abuse" even if it is a one–time, isolated, unrepeated act.

### 2. Discussion

Having concluded that the abuse exclusions in the Vecseys' Homeowners and Umbrella Policies bar coverage for injuries caused by acts that deviate below a baseline measure of appropriate treatment of another, that is, acts that mistreat another, the Court examines whether Plaintiff has proved that Mr. Vecsey's conduct falls within the abuse exclusion.

It is clear to the Court that Mr. Vecsey's conduct was not merely accidental. An injury–causing event is accidental when it is unforeseen or unintentional; an accident is a result caused by an event where the *event itself* is unintended and unforeseen. *See*

*Walukiewicz*, 290 Conn. at 594 ("A typical definition of the term 'accident' is 'a lack of intention or necessity, often opposed to design; an unforeseen unplanned event; [a] *sudden event or change occurring without intent or volition . . . and producing an unfortunate result.*") (emphasis added) (citations omitted).   Under this definition, and despite the Vecseys' mantra that this was "an accident," the evidence makes clear that Mr. Vecsey's conduct was not merely accidental or a mere fortuity.   Mr. Vecsey admitted that he intended to throw the carrot and intended and foresaw that the carrot he intended to throw would fly toward Mrs. Vecsey.

Even if Mr. Vecsey did not intend to cause Mrs. Vecsey's extensive facial and ocular injuries or never foresaw that if he hit her with the carrot it would do such devastating harm, he nonetheless intended to throw the carrot at her or in her direction to make her "shut up." Although Mr. Vecsey testified that he "didn't intend to hit anybody with the carrot" and that he "didn't throw it at anything specifically," and "just [] threw the carrot towards the wall," his cramped description of his conduct was that he threw it "in the direction of the wall that [his] wife and daughter were standing next to."   Despite this less–than–credible description of where he was aiming his carrot projectile, the evidence shows that Mr. Vecsey intended to forcefully hurl his carrot in the direction of Mrs. Vecsey as his final act of contempt and insult to his wife as she turned to leave the room, to thereby end their argument, even if he did not intend to, or expect to cause her bodily injury.

The Court concludes from the trial evidence that, in the context of this marriage relationship marked by hostility and verbal malevolence, and in the context of a heated argument involving yelling, expletives, continuing anger, and without any indication of calm

25

discussion or debate, Mr. Vecsey threw the carrot towards Mrs. Vecsey as a pejorative and disdainful expression of his anger and displeasure with his intoxicated wife, and intended this gesture as a forceful, derogatory put–down, an act of mistreatment, and his way to finally make Mrs. Vecsey "just stop." Mr. Vecsey testified that he threw the carrot towards the wall that his wife stood next to in a "sidearm" motion similar to "skimming a stone across a pond," which is entirely inconsistent with a unfocused act of exasperation such as slamming one's hand down on a table. Had Mr. Vecsey thrown the carrot solely in exasperation, and not to have an emotional impact, he could have slammed it on the floor. However, he threw the carrot sidearm directly towards his wife, whom he frequently verbally antagonized, at a time when he was angry with her and wanted her to "shut up."[15] From the experts' testimony of the amount of damage done, he also threw with considerable force, not a flaccid toss.

Judged either objectively or from the perspective of the Vecseys' own dysfunctional and hostile marriage/relationship, Mr. Vecsey's carrot–throwing was not accidental but was a form of mistreatment of Mrs. Vecsey that fell below a standard of appropriate treatment of one's spouse, even though they both claimed that Mr. Vecsey had never previously struck Mrs. Vecsey.[16] Hurling a half–eaten piece of food at one's spouse to make her back off in a

---

[15] The Court is unpersuaded by Mrs. Vecsey's counsel's summation argument that the abuse exclusion cannot apply in this case because it is inconceivable that a person would "use the [nub end] of a carrot *to try to* physically abuse someone."

[16] Keith Pacific, Mrs. Vecsey's brother, testified that in the late 1990s he witnessed Mr. Vecsey yell at Mrs. Vecsey and then grab her by the shoulders and shake her, at which point he intervened and separated them. While Mr. Pacific's testimony did not lack credibility, this incident is too remote in time to have much probative value, and does not affect the Court's conclusion that Mr. Vecsey's throwing the carrot at Mrs. Vecsey was an

hostile confrontation by means of this physical expression of subordination and disdain is an act of maltreatment of her. It does not matter to the Court's conclusion whether Mr. Vecsey intended that the carrot would strike Mrs. Vecsey or just slam into the wall near her. He threw the carrot contemporaneously with ordering Mrs. Vecsey and Kaelin to "just stop," because "I was exasperated. *I just wanted it to stop.*" Having concluded that Mr. Vecsey's intentional carrot–throwing was an act of physical abuse, as Mrs. Vecsey initially characterized it, the injuries that arose from it fall within the policies' exclusion from coverage of "[a]ny personal injury arising out of . . . physical or mental abuse."

---

act of abuse.

Because the Court does not rely on Mr. Pacific's testimony, Defendants' identical Motions *in Limine* [Doc. ## 58, 63], seeking exclusion of Mr. Pacific's testimony and other character evidence, other bad acts, and state–court records subject to Conn. Gen. Stat. § 54-142a are moot, and will be denied as such.

III.	Conclusion

For the reasons stated above, Safeco has shown that it is entitled to judgment in its favor on both counts of its Amended Complaint [Doc. # 7-1], and further that it is entitled to the following declarations:  There is no coverage for Roderick A. Vecsey under the Homeowners Policy for the claims asserted against him in the Vecsey Personal–Injury Action.  There is no coverage for Roderick A. Vecsey under the Umbrella Policy for the claims asserted against him in the Vecsey Personal–Injury Action.  Safeco has no duty to defend Roderick A. Vecsey in the Vecsey Personal–Injury Action.  Safeco has no duty to indemnify Roderick A. Vecsey for any judgment against him in the Vecsey Personal–Injury Action.  Judgment shall be entered accordingly.


IT IS SO ORDERED.


<u>/s/</u>
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 30th day of September, 2010.